UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

LARRY D. SCHALL,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      CIVIL NO.   3:15cv544
                                          )
CAROLYN COLVIN, Acting                    )
Commissioner of Social Security,          )
                                          )
            Defendant.                    )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) as provided for in the Social Security Act.  42 U.S.C. §416(I).  Section

205[g] of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield, supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.

2.      The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 5, 2010 through his date last insured of December 31, 2011 (20 CFR 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairment: Parkinson's disease (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c), specifically lifting and/or carrying 50 pounds occasionally, 25 pounds frequently; standing and/or walking 6 hours in an 8-hour workday; and sitting 6 hours in an 8-hour workday.

6.      Through the date last insured, the claimant was capable of performing past relevant work as a warehouse supervisor.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from November 5, 2010, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(f)).

(R.22-27).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff filed his opening brief on May 23, 2016  On August 30, 2016, the defendant filed a memorandum in support of the Commissioner's decision, and on September 16, 2016, Plaintiff filed his reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); *accord Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on July 30, 2012 alleging disability beginning February 29, 2012. (A.R. at 224). The Disability Determination Bureau (DDB) denied the Plaintiff's claims on April 24, 2012. *Id*. at 113. Plaintiff requested reconsideration, but was again denied on July 23, 2012. *Id.* at 114. Plaintiff filed a request for an administrative hearing on August 2, 2012. *Id.* On August 23, 2013 and September 20, 2013 Plaintiff appeared via video conference in Elkhart, Indiana before ALJ Patricia Melvin of the Fort Wayne, Indiana Office of Disability Adjudication and Review (ODAR). *Id.* at 78-112 and 36-77. On February 10, 2014, ALJ Melvin issued a partially favorable decision, finding that Plaintiff was not disabled since his alleged onset date but became disabled

4

on July 10, 2013 due in part to Parkinson's disease. *Id.* at 115-128. Plaintiff filed a request for review by the Appeals Council of the Office of Disability Adjudication and Review, and the Appeals Council granted his request for review but issued an unfavorable decision on September 21, 2015. *Id.* at 6-14. Plaintiff then timely filed a complaint with the United States District Court for the Northern District of Indiana.

Plaintiff was born on July 7, 1956. *Id.* at 224. At the time of his filing date, he was 55 years of age. *Id.* Plaintiff graduated from high school and obtained an associate's degree in business administration. *Id.* at 84. Additionally, he served in the Navy from 1975-1981 and received machinist and shipboard firefighter training. *Id.* at 84-85. He has worked as a warehouse supervisor. *Id.* 234-237.

The record first documents Plaintiff's back issues in November of 1993, when he presented to the emergency room and complained of right scapula and arm numbness following an episode of trauma. *Id.* at 311. An MRI of his cervical spine revealed a "moderately large herniated disc present at C6-C7 on the right indenting the thecal sac and flattening the right side of the cervical cord." *Id.* Dr. P.M. Carney, the attending physician, diagnosed Plaintiff with a ruptured cervical disc at C6/C7 and performed an anterior cervical microdiscectomy and fusion C6-C7 with harvesting of left iliac bone graft. *Id.* at 312-313. Five years later, an MRI of the lumbar spine revealed a central protrusion of L4-L5 disc with flattening of the left L5 root sleeve and central protrusion of the L3-L4 disc which minimally indented the thecal sac. *Id.* at 320. In August of 2009 when Plaintiff fell down a flight of stairs after he slipped and lost his balance an X-ray of his abdomen showed fractures of the fifth and sixth ribs. *Id.* at 329-331. A year later, Plaintiff had another accident: he dropped a log onto his foot and fractured his fifth metatarsal. *Id.*

at 338. A doctor at the VA prescribed Plaintiff crutches, but Plaintiff requested a walker. *Id.* at 374.

Only a few months later, Plaintiff presented to Nurse Heather Boyd of the VA and complained of bilateral hand tremors and "body twitches" at night while in bed. *Id.* at 370-371. He elaborated that the tremors were constant and that his co-workers had noticed them. *Id*. at 366. A month later, Plaintiff called the VA and asked for "something to control the shaking for during the day," and "wants to know if he has Parkinson's." *Id*. at 362. Dr. Verma diagnosed Plaintiff with "essential tremors" and prescribed him Primidone 25 mg three times per day. *Id.* at 361.

On June 7, 2011, Plaintiff returned to Dr. Verma and complained of tremors affecting his hands and legs "for over a year now." *Id*. at 359. He informed Dr. Verma that the tremors started in his right hand and right leg, but eventually progressed to the left leg as well. *Id.* He further informed the neurologist that the tremors were nearly constant, and affected him "even when he is sitting." *Id*. Dr. Verma observed tremors involving both hands, both legs, and mild cogwheeling on both wrists and elbows. *Id.* at 360. At a follow-up in August, Plaintiff complained that he had not noticed any improvement in his symptoms, despite taking his prescriptions as ordered. *Id.* at 357. Plaintiff complained that the medication made him very tired, and that he could not drive or write because of the shaking. *Id.* at 355. Dr. Verma again observed bilateral cogwheeling, and prescribed Amantadine 100 mg. *Id*. at 356. In November, Plaintiff called Dr. Verma that his tremors had worsened in all extremities. *Id.* at 507. Dr. Verma increased the dosage of his medication. *Id*. On February 3, 2012, at a neurology follow-up, Plaintiff informed Nurse Cindy Lou Kayal that his tremors were "somewhat better." Dr. Verma observed minimal postural tremor and right leg tremors while seated. *Id*. at 505.

In March of 2012, Plaintiff completed a function report with the assistance of his wife. *Id.* at 255-263. He reported that his shaking or tremors made it hard to feed himself or shave. *Id.* at 256. He indicated, "I don't use the stove much as I forget to turn it off." *Id.* at 257. Plaintiff reported, "I can't remember a lot of things and using a stove is not an option unless someone goes behind me to make sure it is turned off." *Id.* He explained that he does leave home but "sometimes I get 'lost'—cant remember why I am where I am or what I came for." *Id.* at 258. He reported that since his illness his "memory isn't the same." *Id.* at 259. He alleged having difficulty with lifting, squatting, bending, kneeling, using his hands, memory, concentration, and completing tasks due to Parkinson's disease. *Id.* at 260. Plaintiff stated he does "not usually" finish what he starts. *Id.*

On March 26, 2012, Dr. J. Sands, the agency doctor, completed a physical residual functional capacity assessment, in which he found Plaintiff capable of performing a full range of medium work because "medication controlling tremors." *Id.* at 474-475. Dr. Sands cited the neurology follow-up from February 3, 2012 and Plaintiff's statement that his symptoms were "somewhat better" as evidence that Plaintiff's medication controlled his tremors. *Id.* at 475. He further cited Plaintiff's neurology appointment from August of 2011 as evidence that he could perform medium work. *Id.* The treatment notes from that appointment read "medications working partially" and "claimant reported tremors calmed with alcohol." *Id.* Dr. Sands opined that Plaintiff's allegations were "partially credible as severity is not supported by evidence in file." *Id.* at 479. He diagnosed "Tremors, mixed type" rather than Parkinson's disease. *Id.* at 474. In April, 2012, agency pyschologist, Dr. Donna Unvershaw completed a review and determined there was insufficient evidence available to assess the severity of Plaintiff's memory problems. *Id.* at 482-

495.

On July 19, 2012, an MRI of the lumbar spine revealed mild narrowing of the disc spaces from L3 to S1. *Id.* at 741. On August 1, 2012, Plaintiff's wife called the VA clinic and complained that Plaintiff did not sleep and was "doing crazy things." *Id.* at 746. A few days later, Plaintiff and his wife presented to the VA clinic, and she complained that Plaintiff's mental capacity was in decline. *Id*. at 727. Plaintiff complained that he fell in his bathtub and injured his back a month prior to the visit. *Id.* at 729. He reported that his back "popped out" often and he had to spend several days lying down in order to recover. *Id.* Physical examination revealed positive straight leg raise, decreased range of motion, and a "lumbar traction" had to be stopped due to pain. *Id*. Dr. Paul Kuria, the attendant physician, prescribed Plaintiff a Tens Unit. *Id.* at 729-730. He indicated that Plaintiff had mild radiculopathy on the right side, secondary to involvement of the L2/L3L/L4 nerve roots. *Id.* at 737. 729-730. In September, Plaintiff returned to Dr. Verma and complained of continued tremors five to six times per week that were exacerbated by exertion. *Id*. at 726. Plaintiff's wife complained that Plaintiff's memory had greatly worsened, "wife will tell him to take dishes out and vet will walk outside with them." *Id.* at 727. She further informed Dr. Verma that her husband hit and kicked her in his sleep. *Id*. Dr. Verma observed bilateral cogwheeling and opined, "in view of his history of boxing and dealing with pesticides, the patient would like to keep the possibility of Parkinsonism under consideration." *Id.*

Later that month, Plaintiff presented to Dr. Beth Wittington for a neurology consultation and second opinion. *Id.* at 663. Plaintiff complained of back pain, perpetual tremors in his arms and legs, "sloppy writing," and memory loss. *Id.* He informed Dr. Whittington that, while he felt

that the medication helped, "the tremor is never gone." In regard to memory loss, he explained that he often left the water running and had set his stove on fire when he left it on. *Id.* His wife told Dr. Whittington that she noticed a vocal tremor as well. *Id.* Dr. Whittington observed tremor with outstretched arms and finger-to-nose bilaterally, head titubation, vocal tremor, and guarded and wide gait due to back pain. *Id.* Dr. Whittington recommended prosthetic consult for a cane "due to his back pain," increased Primidone to 50 mg, ordered neuropsychological testing, sleep study, and HCT. *Id.* at 666. A few days later, Plaintiff received a prescription for a cane and lumbar support brace due to a gait abnormality from back pain. *Id*. at 658, 718.

In October, Plaintiff presented to the VA clinic for a neuropsychology consult. *Id.* at 713. A psychology student intern, John M. McConnell, conducted the exam under the supervision of neuropsychologist, Dr. Javan Horwitz. *Id.* at 715. The initial neobehavioral evaluation revealed primary tremor in upper and motor extremities, visuospatial functioning impairment, impaired immediate memory, consolidation, spontaneous retrieval, recognition, reasoning, problem-solving, judgment, and insight. *Id*. at 713. Dr. Horwitz diagnosed Plaintiff with end-stage Wernicke-Korsakoff syndrome, and cited significant impairments in memory consolidation, recall, recognition, and autobiographical memory impairment. *Id*. at 714. Dr. Horwitz noted that Plaintiff's prognosis was poor; that he did not possess capacity to manage his own affairs or hold a job; and that he should be placed in 24/7 supervised care because he was at significant risk for harming himself or others. *Id*.

In November of 2012, the VA granted Plaintiff 30% service-connected disability benefits for his back. *Id*. at 749. On December 17th, Plaintiff again presented to Dr. Verma and reported that while his tremors had largely been calm and under control, there were "persistent and at a

much lower intensity." *Id.* at 705. Dr. Verma observed mild postural tremor, mild right leg tremor while sitting, and mildly unsteady walk. *Id.* at 706. He noted that "Dr. Horwitz's consultation note was reviewed with patient. He has diagnosed him with Wernicke's encephalopathy due to chronic alcoholism." *Id.* He diagnosed Plaintiff with baseline essential tremor, superimposed Parkinsonism, restless leg syndrome and REM behavioral sleep disorder, and history of back pain and hyperlipidemia. *Id.* In May of 2013, Plaintiff presented to Dr. Verma and reported that his tremors were under good control, but that he still had some imbalance. *Id.* at 691. Dr. Verma observed mildly unsteady gait, and instructed Plaintiff to "taper off" Ropinrole and Amantadine. *Id.* One month later, Plaintiff's wife called Dr. Verma and reported that Plaintiff's tremors had become "very exaggerated" since he tapered off his medication. *Id.* at 692. Dr. Verma instructed her to have Plaintiff restart his medication. *Id.*

On August 23, 2013, Plaintiff attended an administrative hearing via teleconference in Elkhart, Indiana before ALJ Patricia Melvin of the Fort Wayne, Indiana Office of Disability Adjudication and Review (ODAR). *Id.* at 81. Plaintiff testified that he had experienced significant weight loss and attributed that to his pain medication, "everything tastes – I don't eat like I, you know, normally would eat." *Id.* at 83. He further testified that he lived with his disabled wife and autistic grandson, both of whom received disability benefits. *Id.* at 85. Additionally, Plaintiff informed the ALJ that he last worked in February of 2010 as a warehouse supervisor. *Id.* at 86. He explained that he did not lift or carry anything in that job because his employer was aware that he could not, "They didn't allow me to do any of that because I was – that was something I brought up front when I first started. So they wouldn't allow me to go inside any of the trucks or anything like that." *Id.* Further, Plaintiff's employer laid him off after they hired him an assistant

to help him with lifting. *Id.* at 87. He testified that he was also terminated from his previous job of seven years, because he missed work due to back pain. *Id*. at 91.

Next, Plaintiff testified that he began to experience symptoms of Parkinson's disease at his job in 2009 and 2010:

> I couldn't write, I couldn't do anything with my hands or anything because I – if my boss seen me, I would have lost my job for sure. So I was, like, I had this friend of mine, just had him fill in my paperwork at the end of the day for me so I didn't have to, so she wouldn't see it.

*Id.* at 92. He elaborated that a neurological report confirmed that he had Parkinson's at that time, but he sought a second opinion. *Id.* The second doctor "tapered" Plaintiff off his Parkinson's medication to see whether it was the cause of his tremors, "When they tapered me down off the Parkinson's disease medication, then the tremors got really bad. They got real bad again." *Id.* at 93. When asked if his medications were effective, Plaintiff testified that they did not prevent him from shaking when active:

> [I]t's always like that. I used to be I could settle down and then make it go away, but it doesn't want to go away. . . .It doesn't prevent me from the shaking; it doesn't – I'm on my medicine right now. We have a computer at home. I barely use it because I can't hold the mouse still enough to get that little arrow to click on something.

I*d*. at 95-96. Plaintiff further informed the ALJ that "a couple of beers would settle down tremors," and that he had stopped drinking caffeinated beverages and smoking cigarettes in order to stop his tremors but that it had not helped. *Id*. at 96-97. When asked why he could not work, Plaintiff responded, "I just can't work. I can't think. I guess I don't know what I'm doing sometimes." *Id*. at 98. Plaintiff testified that he did not remember precise dates, but that he began to experience cognitive issues around 2011, and that his neurologist told him he was "slow." *Id*.

at 98. When asked how his cognitive issues affected his ability to work, Plaintiff responded:

> I can't concentrate at all. I can't remember what I did a couple of minutes ago, or 30 minutes ago, or five minutes ago. I'm dangerous. I mean, at home, I put a skillet on the stove and I'll, like, ask my wife if she wants a couple of eggs or something. I'll forget it. I forget I even did it. I'll walk away from it. I set the stove on fire four or five times. I run the kitchen sink over all the time because I might do the dishes and I'll turn the water on. But a few minutes after I walk away from doing it, I forget I turned the water on. It's all the time. It's all the time. It's a daily basis thing. That's why I keep talking to my doctor. . . .I'm supposed to have somebody with me all the time, but I have a tendency to wander off.

*Id*. at 98-99. He further informed the ALJ that his doctor prescribed him Thiamine for his cognitive and memory issues, but that "it doesn't do any good." *Id.* at 99. Plaintiff then testified that degenerative disc disease in his back prevented him from sitting, standing, and walking for prolonged periods of time, "I have three or four coolers out in the backyard. So I can walk so far in my back yard, and I sit down on a cooler. I rest a little bit, and then I get up and I walk over to the next cooler." *Id.* at 100-101. He rated his pain at a 5-6/10 and informed the ALJ that he wore women's corsets for relief because back braces did not work for him. *Id.* at 102-103. He stated that the pain radiated into his legs five to six times per year and lasted for about an hour every time. *Id*. at 103. He further informed that neither physical therapy nor narcotic pain medication had significantly helped his pain, but that his TENS unit provided some relief from "sharp pain." *Id.* at 104-105. Plaintiff also complained of dizzy spells and monthly falls. *Id*. at 110.

Due to a technical difficulty that resulted in the deletion of the rest of the initial hearing, Plaintiff had to reappear for hearing on September 20, 2013. *Id.* at 36. He did so from Elkhart, Indiana via teleconference before ALJ Melvin of the Fort Wayne Office of Disability Adjudication and Review (ODAR). *Id.* Plaintiff began the new hearing by testifying that he occasionally watched television and movies; occasionally went to the store; used a shower chair

to bathe; and often needed the assistance of his wife or a "grabber" to help him get dressed. *Id.* at

42. He told the ALJ that he would occasionally drive a few blocks to "pick up odds and ends" for

his wife, and that he sometimes forgot where he was going in the middle of a trip. *Id.* at 43.

Additionally, Plaintiff informed the ALJ that he assisted his wife with household chores like

vacuuming and making their bed, but that his grandson moved in with them to assist them and did

90 percent of the daily chores. *Id.* at 44. He further stated that he took two naps per day due to

side effects of his pain medication, and that his doctor prescribed him a walker, cane, and

crutches for daily use. *Id.* at 47 and 48. Finally, Plaintiff stated that he attempted to clean the

gutters on his house and fell off the roof a few months prior to the hearing. *Id.* at 49.

     After Plaintiff concluded his testimony, his wife testified. *Id.* at 63. Plaintiff's wife

testified that his tremors had started three to four years prior to the hearing. *Id.* at 64. She testified

that plaintiff had difficulty shaving and eating:

> Well, he has good days, he has bad days. But when he has the good days, he still
> shakes. But when he the really bad days, then when he goes to put food in his
> mouth, there's not usually food in his spoon or his fork when he gets it to his
> mouth. And then he has to – it takes him a while to eat.

*Id*. at 65. She informed Plaintiff's attorney that Plaintiff got lost when running errands for her,

and often had to leave her vehicle in the parking lot at the store because he could not find it after

he finished shopping. *Id.* She further stated that she was Plaintiff's power of attorney because of

his memory issues, and that he needed 24/7 supervision because "he can harm himself. Just, like,

getting lost and getting in other people's cars that he doesn't know." *Id.* at 67-68. Finally,

Plaintiff's wife testified that her husband's fall from his roof had occurred when she fell asleep

and was not watching him. *Id.*

At the conclusion of Plaintiff's wife's testimony, the ALJ called a vocational expert to testify. *Id.* at 72. The VE characterized Plaintiff's past jobs as "warehouse supervisor." *Id.* at 73. The ALJ then asked him to consider a hypothetical individual of Plaintiff's age, education, and work experience who could lift up to 50 pounds occasionally, lift or carry up to 25 pounds frequently; stand or walk for approximately six of eight hours, and sit for approximately six of eight hours, with normal breaks. *Id.* The vocational expert testified that such an individual could perform Plaintiff's past work. *Id.* Next, the ALJ limited her second hypothetical individual to sedentary work with the ability to lift up to ten pounds occasionally; limited pushing and pulling ability with the right upper extremity to occasional; limited right overhead reaching to occasional; and stipulated that the individual would require an assistive device when standing and for ambulation. *Id.* at 73-74. The VE testified that the hypothetical individual would not be able to perform any work in the national economy. *Id.* at 74.

As noted above, on February 10, 2014, the ALJ issued an unfavorable decision. *Id.* at 119-130. At step two, the ALJ concluded that Plaintiff suffers from Parkinson's disease. *Id.* at 121. At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Commissioner's listed impairments. *Id.* at 123. The ALJ concluded Plaintiff could perform a full range of medium work with no manipulative or mental limitations from his alleged onset date until his established onset date, or July 10, 2013. *Id.* at 123-124. Thereafter, he was limited to a full range of sedentary work. *Id.* at 126. The ALJ determined that Plaintiff was capable of performing his past relevant work as a warehouse supervisor prior to July 10, 2013, but was unable to perform such work and was disabled under the medical vocational guidelines for the period following such date. *Id.* at 127-

128.

On September 21, 2015, the Appeals Council issued an order granting the Plaintiff's request for review. *Id.* at 9-11. The Appeals Council found that the ALJ "no longer had jurisdiction" to issue her March 11, 2014 unfavorable determination and vacated that decision. *Id.* at 9-10. The Appeals Council adopted the ALJ's statements from her February 10, 2013 decision concerning the issues in the case and evidentiary facts "except as otherwise provided," and found that the claimant "was not disabled at any time from his alleged onset date of November 5, 2010 through his date last insured of December 31, 2011." *Id.* The Appeals Council invoked the fact that "the claimant's disability reports did not allege any mental impairments and two State Agency psychological consultants opined that there was insufficient evidence to support a mental impairment prior to the claimant's date last insured." *Id.* at 10. The Appeals Council added that the Plaintiff's diagnosis of Wenicke-Korsakoff disease as "conducted by a psychology student intern," and therefore found that this was "not a medically determinable impairment." *Id.* It reasoned that the October 2012 evaluation "occurred after the claimant's date last insured," and found "no evidence that the claimant's Parkinson's disease caused mental limitations during the period at issue." *Id.* at 11.

In support of remand or reversal, Plaintiff first argues that the finding that his Parkinson syndrome or combined impairments did not meet or equal the criteria of Listing 11.06 or 12.02 on or before his date last insured is not supported by substantial evidence and the relevant legal standards. At step three in the disability analysis, the ALJ is required to determine whether the claimant meets or equals any of the listed impairments found in the Listing of Impairments, found in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir.

2004); 20 C.F.R. § 404.1520(a)(4)(iii). For each listed impairment, there are objective medical findings and other specific requirements that must be met to satisfy the criteria of that Listing. 20 C.F.R. §§ 404.1525(c)(2)-(3), 416.925(c)(2)-(3). When a claimant satisfies the criteria to meet a listed impairment, that person is deemed disabled and is automatically entitled to benefits. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a); 404.1525(c)(3), 416.925(c)(3). A claimant may also demonstrate presumptive disability by showing his impairment is accompanied by symptoms that are equivalent in severity to those contemplated by a specific Listing. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5); 404.1526; 416.926.

In the present case, Plaintiff argues that the Commissioner first erred by offering an unsupported and unreviewable analysis of whether Plaintiff's well-documented tremors met the criteria of Listing 11.06 on or before his date last insured. A claimant is entitled to a finding of disability if he establishes evidence of "Parkinsonian syndrome with the following signs: Significant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 11.06. The ALJ here simply wrote that the record "does not demonstrate Parkinson's disease with the following signs: significant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station." (A.R. at 124)

Plaintiff contends that the ALJ's analysis, which the Appeals Council incorporated into its decision, provides no insight into how the agency concluded that Plaintiff's tremors did not satisfy the criteria of Listing 11.06 on or before his date last insured. *Id.* at 124, 9-11. Plaintiff points out that the ALJ did not address the evidence showing that the Plaintiff presented in June

16

of 2011 with complaints that he "has noticed tremors in both of his hands, even while he is sitting and the hand is resting on the arm of the chair." *Id.* at 359. The ALJ did not discuss the examiner's observation of an "obvious" tremor in the right lower extremity as well as mild cogwheeling in both wrists and elbows and "[t]remors involving both hands are noted, right worse than left, postural more than resting." *Id.* at 360. The ALJ also did not discuss how he reported in August of 2011 that "[h]e is not able to write also because of the tremors," or that Dr. Verma observed mild cogwheeling bilaterally. *Id.* at 355-356. The ALJ also did not discuss how Plaintiff reported suffering from difficulty using his hands due to these tremors. *Id.* at 260. Clearly, the ALJ's finding that the Plaintiff's bilateral hand tremors did not produce a sustained disturbance of his ability to perform gross and dexterous movements on or before his date last insured is "peculiar and unexplained." *Kastner v. Astrue*, 697 F.3d 642, 646-648 (7th Cir. 2012). By failing to "evaluate any of the evidence that potentially supported [Plaintiff's] claim" so as to permit meaningful review of her unfavorable finding, the ALJ committed legal error. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Thus, remand is appropriate so that these issues may be properly discussed.

Plaintiff further claims that the ALJ further erred by offering no discussion of whether Plaintiff's combined mental impairments met or equaled Listing 12.02 on or before his date last insured, which presumes disability for "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain" and the "presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.02. This listing is satisfied with evidence of "a loss of specific cognitive abilities or affective changes," memory impairment, and marked

limitations in two of the following domains: activities of daily living, social functioning, or maintaining concentration, persistence, and pace. *Id.* The record shows that Plaintiff was diagnosed with end-stage Wernicke-Korsakoff syndrome in October of 2012, and exhibited significant impairments in memory consolidation, recall, recognition, and autobiographical memory impairment (A.R. at 714) Dr. Horwitz noted that Plaintiff's prognosis was poor; that he did not possess capacity to manage his own affairs or hold a job; and that he should be placed in 24/7 supervised care because he was at significant risk for harming himself or others. *Id.* The ALJ here did not discuss Listing 12.02. *Id.* at 123-124. The ALJ erroneously concluded that "the first documentation of memory problems in the medical record is in August 2013," and that the Plaintiff "has no limitation in daily activities due to his mental impairment." *Id.* at 122. For this additional reason, remand is warranted.

Moreover, the ALJ committed error by failing to obtain a reliable medical opinion before concluding Plaintiff's Parkinson's disease or combined impairments did not equal the criteria of Listings 11.06 or Listing 12.02 on or before his date last insured. Whether a claimant meets or equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue. *Barnett*, 381 F.3d at 670 (citing 20 C.F.R. § 404.1526(b)). SSR 96-6p provides that an ALJ "must obtain an updated medical opinion" when she determines either "the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable" or when "additional medical evidence is received that . . . may change the State agency medical or psychological consultant's finding" regarding equivalence. In the present case, the record does not contain a reliable medical opinion regarding whether the Plaintiff's Parkinson's disease or mental impairments medically equaled Listings 11.06 or 12.02.

Plaintiff also points out that the Appeals Council improperly found that Plaintiff did not

suffer from a medically determinable impairment of Wernicke-Korsakoff syndrome on or before

his date last insured, and the Commissioner improperly rejected Plaintiff's allegations of mental

limitations before December 31, 2011. Although this Court should not reweigh the evidence or

substitute its judgment for that of the agency's, *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir.

2012), "this does not mean that [it] will simply rubber-stamp the Commissioner's decision

without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In

rendering a decision, the agency is not required to provide a complete and written evaluation of

every piece of testimony and evidence, but "must 'build a logical bridge from the evidence to his

conclusion.'" *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Roddy v. Astrue*, 705 F.3d

631, 636 (7th Cir. 2013).

In the present case, the Appeals Council reasoned that "the claimant's disability reports

did not allege any mental impairment," the state agency psychological consultants felt there was

insufficient evidence to evaluate Plaintiff's mental limitations, and the assessment leading to this

diagnosis "was conducted by a psychology student intern, not an acceptable medical source."

(A.R. at 10) Plaintiff contends that none of these rationales provide the logical bridge to support

the Commissioner's finding that Plaintiff had no mental limitations as of his date last insured in

December, 2011. The Commissioner also ignored how Plaintiff did report mental limitations

during interactions with the agency in both March and August of 2012.

Additionally, the Appeals Council erroneously found that Plaintiff was diagnosed as

having Wernicke-Korsakoff syndrome by a psychology intern who was not an acceptable medical

source. (A.R. at 10) "A physical or mental impairment must be established by medical evidence

consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508; *see also*, SSR 96-3p (recognizing that symptoms will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence, i.e., signs and laboratory findings, that he has a medically determinable physical or mental impairment that could reasonably be expected to produce the alleged symptoms). The record here shows that a psychology student intern, John M. McConnell, conducted a neuropsychology evaluation under the supervision of neuropsychologist, Dr. Javan Horwitz. *Id.* at 715. Dr. Horwitz counter-signed McConnell's evaluation report. *Id.* Thus, another treating physician later documented that "Dr. Horwitz' consultation note was reviewed with patient. He has diagnosed him with Wernicke's encephalopathy due to chronic alcoholism." *Id.* at 706. Clearly, the Appeals Council's finding that the Plaintiff's diagnosis of Wernicke-Korsakoff syndrome was not made by an acceptable medical source is not supported by the record, and requires a remand.

Plaintiff further asserts that the Appeals Council improperly discounted the October 2012 evaluation and diagnosis of Wernicke-Korsakoff syndrome on the basis that it occurred after the Plaintiff's date last insured. (A.R. at 11) The Seventh Circuit has expressly held that evidence created after a date last insured is relevant to a claimant's conditions and limitations before such date. *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010). Finding error where an ALJ disregarded evidence created after a date last insured, the court wrote:

> The administrative law judge should either have determined whether the plaintiff's ailments are at present totally disabling, and, if so, have retained a medical expert to estimate how grave her condition was in March 2004, the last date before her coverage expired; or the judge should have determined directly whether the plaintiff was totally disabled by then--but in making that determination he must (as

under the first approach) consider *all* relevant evidence, including the evidence regarding the plaintiff's condition at present.

*Nary Kheng v. Astrue*, 2010 U.S. App. LEXIS 9727 at **1-2 (7th Cir. 2010)(emphasis in original) (internal citations omitted). The Commissioner's explicit disregard of medical evidence establishing the Plaintiff's significant memory problems due to Wernicke-Korsakoff syndrome and/or Parkinson's disease is therefore grounded in a legal error. In light of the Appeals Council's own recognition that the state agency psychologist did not have enough evidence to evaluate the Plaintiff's mental limitations prior to his date last insured during April and July of 2012, the Commissioner should have obtained a reliable medical opinion on when the Plaintiff's mental functioning began to deteriorate.

Next, Plaintiff argues that the ALJ improperly rejected the Plaintiff's allegations of cognitive problems which began to worsen during the second half of 2011. A court should not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004)). However, an ALJ does not possess unlimited discretion to reject a claimant's testimony. When the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse or remand a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006)).

In the present case, the Plaintiff testified that he began to experience cognitive issues

during the end of 2011 when "the shaking tremors started." (A.R. at 98 ("But somewhere in the midst of the end of that year or something like that.")) The Commissioner discounted the Plaintiff's allegations on the grounds that his disability reports "did not allege any mental impairment." *Id.* at 10. The Appeals Council specifically cited reports which were completed on March 2nd, June 27th, and August 3rd. *Id*. at 10, 248-250,279-282, 286-290.

The Commissioner's decision to reject the Plaintiff's allegations of mental limitations prior to his date last insured is patently wrong for several reasons. First, the Appeals Council ignored that in one of those disability reports, the Plaintiff did in fact report, "Sometimes I forget where I am going" and indicated this represented no change in his ability to complete daily activities. *Id.* at 289. The Appeals Council also ignored how on March 14, 2012, shortly after he completed the first disability report, Plaintiff and his wife completed a Function Report. *Id.* at 255-263. In it he indicated, "I don't use the stove much as I forget to turn it off." *Id.* at 257. Plaintiff reported, "I can't remember a lot of things and using a stove is not an option unless someone goes behind me to make sure it is turned off." *Id.* He explained that "sometimes I get 'lost'—cant remember why I am where I am or what I came for." *Id.* at 258. He reported that since his illness his "memory isn't the same." *Id.* at 259. He alleged having difficulty with memory, concentration, and completing tasks due to Parkinson's disease. *Id.* at 260. Plaintiff indicated he does "not usually" finish what he starts. *Id.* The Appeals Council's apparent conclusion that Plaintiff did not initially report suffering from any mental limitations when he filed his claim for benefits is therefore not borne out by the record as a whole. The Commissioner is not entitled to simply select evidence favoring her conclusions, but must "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335

F.3d 539, 543 (7th Cir. 2002). Thus, for this additional reason, remand is appropriate.

Moreover, the Appeals Council made profound logical flaws when rejecting the Plaintiff's mental allegations. Although he did not list a mental diagnosis in his initial disability report, he listed Parkinson's disease, which is itself known to cause some cognitive problems. *Id*. at 249. Plaintiff also did not know he suffered from Wernicke-Korsakoff syndrome until October of 2012, and it is not surprising that he would fail to list such a diagnosis on a report he completed in March of that year. *Id*. Finally, the Appeals Council unreasonably discounted allegations of severe memory problems on the grounds that the Plaintiff failed to mention such problems when completing his disability report, quite possibly due to his poor memory. As noted above, the record provides contemporaneous documentation that Plaintiff was having such difficulties at least as early as March, 2012. *Id.* at 255-263. The Commissioner's decision to reject the Plaintiff's allegations of worsening cognitive problems during the second half of 2011 is therefore "patently wrong" and warrants remand. *Clifford,* 227 F.3d at 872.

Next, Plaintiff argues that the ALJ's finding that the Plaintiff could sustain the exertional demands medium work without any manipulative limitations on or before his date last insured is not supported by substantial evidence and the relevant legal standards.

The ALJ first erred by ignoring a line of evidence showing the Plaintiff's deterioration prior to his date last insured. While an ALJ need not mention every piece of evidence in record, he must generally show that he considered evidence strongly supporting disability and enable a reviewing court to trace his reasoning for rejecting it. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009)). The ALJ noted that in June 2011 medication was helping with Plaintiff's tremors and his gait was normal, his extremities had

full strength in August of 2011, and by February of 2012 his tremors were "under adequate control." (A.R. at 125) But the ALJ ignored a line of objective evidence showing his deteriorating physical abilities throughout the second half of 2011. At his June 2011 examination, for example, Plaintiff reported that his tremors were now nearly constant, and affected him "even when he is sitting." *Id*. at 359. Dr. Verma observed tremors involving both hands, both legs, and mild cogwheeling in both wrists and elbows. *Id*. at 360. At a follow-up in August, Plaintiff complained that he had not noticed any improvement in his symptoms, despite taking his prescriptions as ordered. *Id.* at 357. Plaintiff complained that the medication made him very tired, and that he could not drive or write because of the shaking. *Id*. at 355. Dr. Verma again observed bilateral tremors and cogwheeling before adding another medication to his regimen. *Id.* at 355-356. In November, Plaintiff called Dr. Verma that his tremors had worsened in all extremities. *Id*. at 507. Dr. Verma increased the dosage of his medication. *Id*. at 508.

Plaintiff does not dispute that after this medication adjustment, his tremors improved somewhat after his date last insured. But because the ALJ failed to adequately consider how severely his tremors were affecting his functioning during the second half of 2011, when he was required to establish that his disability began, the ALJ did not build a logical bridge which enables meaningful review of her finding that he could sustain the exertional demands of medium work without any manipulative limitations on or before his date last insured of December 31, 2011. As the Seventh Circuit has explained, "The key is not whether one has improved (although that is important), but whether [one has] improved enough to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014). In light of how the ALJ recognized that Plaintiff was prescribed a cane in September of 2012 and had "some

imbalance" as well as a "mildly unsteady" gait by the end of 2012, her finding that his medications were so effective in controlling his symptoms stemming from Parkinson's disease that he could sustain the exertional demands of medium work without any manipulative limitations on or before his date last insured is not supported by substantial evidence. (A.R. at 125-126)

The ALJ improperly invoked the Plaintiff's course of treatment and daily activities to reject his allegations. She wrote that he "has not generally received the type of medical treatment one would expect for a totally disabled individual." *Id.* at 126. However, this is not reasonable in light of how the most common treatment for Parkinson's disease is medication and therapy and how "[s]urgical treatment is reserved for PD patients who have exhausted medical treatment of PD tremor or who suffer profound motor fluctuations." The ALJ also improperly rejected the Plaintiff's allegations because he "has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (A.R. at 126) But it is difficult to follow the ALJ's reasoning because she did not explain herself in a way that enables meaningful review, and also reached the exact opposite conclusion to find that "[b]eginning on July 10, 2013, the claimant has described daily activities which are quite limited and which are consistent with the complaints of disabling symptoms and limitations." *Id.* at 127.

Plaintiff notes that the ALJ never mentioned the testimony of the Plaintiff's wife which addressed his extensive limitations with daily activities, including his difficulty feeding himself and his tendency to get lost "quite often" if asked to go anywhere alone. (A.R. at 63-68; 124-128, 9-11) She also ignored how in March of 2012 Plaintiff reported having difficulty with lifting, squatting, bending, kneeling, using his hands, memory, concentration, and completing tasks due

to symptoms associated with Parkinson's disease. *Id.* at 260. The Seventh Circuit has repeatedly rejected this type of cursory invocation of a claimant's daily activities because "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th Cir. 2013) (citations omitted).  Therefore, remand is appropriate on the issue of limitation of daily activities.

## Conclusion

On the basis of the foregoing, this case is hereby REMANDED to the Commissioner for proceedings consistent with this opinion.


 Entered: October 18, 2016.


s/ William C.  Lee
William C. Lee, Judge
United States District Court
